Fernando **DAVILA**, Libelant,

v.

S/S **VERCHARMIAN**, her engines, etc., in rem, and Vergottis Ltd., as owner, in personam, Respondents.

No. 8124.

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 19, 1965.

Sidney H. Kelsey, Norfolk, Va., for plaintiff.

Charles F. Tucker, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for respondents.

WALTER E. HOFFMAN, Chief Judge.

Libelant, a citizen of Spain and a member of the crew of the SS VERCHARMIAN, a vessel flying the flag of Great Britain, was seriously (but not permanently) injured when he fell through a small open hatch in the upper deck of the extreme forepeak of the vessel on July 26, 1960, at approximately 7:30 A.M.

The crux of this case lies in the lighting conditions prevailing at the time and the duty to warn under the existing circumstances. On the issue of liability the only testimony presented was by deposition of the libelant and the boatswain, Antonios Papageorgiou. We think that the final outcome rests, in the main, on the burden of proof.

Each morning while at sea it was libelant's duty to sound the tanks. Even when in port it was necessary to make these soundings every three or four days. Libelant had been accordingly perform-

ing this duty practically every day for more than five months. In a small room on the port side of the upper deck forecastle head a quantity of rags were available for the purpose of cleaning the sounding bar after its use in each of approximately twenty tanks. Commencing his duties each morning while at sea it was libelant's general practice to obtain a quantity of rags from this small room and then proceed to carry out his sounding operations. The forepeak tank was usually the first of the tanks to be sounded and it was somewhat to the starboard side of the vessel. That libelant was thoroughly familiar with the area involved, including the hatch, is conceded. In a period of nearly six months he would have visited the area in excess of one hundred times for the purpose of obtaining wiping rags, without counting any other duties which may have brought him there.

Libelant approached the hatch from the starboard side. If he had approached from the port side where the locker or small room was located, he would not have been required to cross over the hatch. However, coming from the starboard side it was necessary for him to cross over, or jump over, the hatch to reach the door of the room where the rags were kept.

When questioned about the lighting conditions in the forecastle head, libelant said: "No lights. I only could see the guys who were talking there." The "guys" to whom libelant refers were the boatswain, Papageorgiou, and an AB seaman named Demetrios Vlassopoulos. Questioned further the following appears:

"Q. What happened when you went into the forecastle head?
"A. See, Demetrios Valsopoulous (sic) and the boss [Papageorgiou] they were talking. Demetrios Valsopoulous he was standing in one edge of the hatch, with one feet, and the other feet on the other side. And I look and I thought the hatch was closed. It was dark, I couldn't

see the door was open or not. So I kept awalking and I fell."

Later, libelant was asked and he replied:

"Q. Was there any other light in the forecastle head?

"A. That I don't remember. Maybe inside maybe in the room in the place where I was going to get the rags a little farther was about 6 yards from where I fell maybe was light, but I don't know."

Libelant had previously been interrogated as to light switches and their locations, in response to which he testified:

"A. They have about 3 or 4 switches, but the switch they always put is the one on top of the hatch, the little hatch where I fell. It is a little light there special for that hall."

Questioned as to why he didn't turn the light switch on, libelant replied:

"Because the guy was there. In that switch I thought the lights were out, you know, switch, because always maybe sometimes twice a day the light went on, electrician had to come there and fix the light, always trouble with the lights."

With the assistance of the plans and attempting to reconstruct the testimony to locate the hatch in question, we believe it to be the second small hatch aft of the forward peak of the vessel. The size of the hatch opening as described by the libelant and the boatswain was three feet by three feet, but the plans indicate that the hatch was 30 inches square and we believe this to be correct. The hatch coaming extended approximately six inches above the deck.

The hatch led to a storage area where, at the time in question, a quantity of lumber had been placed. The boatswain, together with Vlassopoulos and a Spanish seaman named Manuelo (Manuel Castra), were engaged in removing lumber from the space below the hatch opening. The

hatch had been opened nearly 30 minutes when libelant met with his accident. The three seamen had started their work at about 7 A.M. On the day prior to the accident the hatch had been opened for a period of 30 minutes to one hour. While the testimony is not clear that libelant saw the men working there the day before the accident, he does concede that the lights were on at that time and explains, "Sometimes I get there late, maybe 7:40 or 8:00 o'clock and guys is working there." Of course, when men are not working in the area the hatch is closed and locked.

The boatswain, Papageorgiou, described the lighting conditions as one light "right on the hatch", one light to the left and one light to the right of the small hallway, and a portable light below inside the hatch. He claims that all four lights were in operation. Proctors for libelant emphasize the testimony of libelant where he said that the area had been without lights for three and one-half months. If this could be accepted as a correct statement of fact, there would be no difficulty in fixing liability upon the respondents. However, libelant testified on this point:

> "And the place where I fell being without lights for almost 3½ months, that is why they always put a cluster light down in the place where I fell."

Assuming arguendo that the permanent light in the storeroom below the hatch opening had been out for this period of time—a fact that is partially substantiated by the boatswain's statement that a portable light was in the lower area—this has nothing to do with libelant's accident as this was below the place where libelant was walking. The fact that three men were working in the area carries a strong inference that the lighting was sufficient. Indeed, in addition to what libelant heretofore described as having been seen, he testified:

"Q. Did you see the two men when you went in?

"A. Sure.

"Q. Where were they?

"A. One was standing right in the top, in the hatch with the hand on the door or the hand on the wall because the door hooks in the wall, and he was standing ready to close it, I think. They always close when they finish. But that day, they and him talking and they forget to close the door. When I walk, the color of the door was painted silver. They paint it silver to look to see."

"Q. You could see the two men—

"A. Yes.

"Q. —even though there was no light in there?

"A. Yes.

"Q. Where was the light coming from? Through the door?

"A. Through the other door.

\* \* \* \* \*

"Q. You knew where the hatch opening was, didn't you?

"A. Yes.

"Q. And you could see the two men standing near the hatch opening?

"A. One was standing, yes. I thought the hatch was closed.

"Q. Why did you think it was closed?

"A. Because that is impossible for leaving that door open like that. Always when I go down the first thing is close the door. So I keep awalking. I saw the man standing there. I figured the door was closed.

"Q. Why didn't you look to see if it was closed?

"A. Because that man he was standing in the top and I thought the door was closed. I went in the side."

Much is made of the fact that the boatswain failed to warn libelant as admittedly the boatswain observed libelant as he was approaching the hatch

opening. It is urged that the recent pronouncement in Olah v. S. S. Jaladurga, 4 Cir., 343 F.2d 457, where the court held as a matter of law that respondent was negligent in failing to warn of danger when "his place of work was in the area of danger" is applicable to this situation. We disagree. Assuming that the lighting conditions were sufficient—as the Court finds—there is certainly no duty to warn anyone approaching an open hatch which would be apparent to anyone through the medium of "looking downward", which libelant admits that he did not do. In Olah, the libelant had no knowledge that the hatch was about to be opened and the decision there turned on the question of foreseeability. Certainly the law has not reached the point where warnings must be issued to seamen who are approaching a ladder leading to a lower deck, or approaching an open hatch which is in plain view. Reliance upon Pioneer Steamship Company v. Hill, 6 Cir., 1955, 227 F.2d 262, is misplaced. In that case a hole had been cut into the deck of a coal bunker, all of which was unknown to the injured man who fell therein where the area was in darkness. The shipkeeper, employed by the shipowner, had knowledge of the existence of the hole and was in a position to see the man approach the hole and warn him, but failed to do so. In short, the duty to warn requires the performance of that duty where there is an "existing dangerous condition" but an open hatch is not, without more, an "existing dangerous condition." We hold that there was no duty to warn in this case. The boatswain had no reason to anticipate that libelant would walk over the hatch coaming and fall.

■ The conclusion is that there was no negligence and the vessel was seaworthy. It is, therefore, unnecessary to discuss the issue of contributory negligence which is obvious. Proctors for libelant argue that such findings of no negligence and a seaworthy vessel are tantamount to concluding that libelant was literally attempting to injury himself. To the contrary, it is simply a matter of deliberate inattention on libelant's part. As this accident is reconstructed it would appear that libelant, upon entering the room, must have concluded that his fellow seamen had completed their work as they were then engaged in conversation. Libelant, carrying a sounding bar, was probably desirous of joining in this conversation and, erroneously assuming that the work had been completed and the hatch cover replaced, did not bother to "look down" but proceeded to walk the few feet to the coaming in the belief that he would walk across the top of the hatch cover and join his fellow seamen. Undoubtedly the height of the hatch coaming would tend to obscure the true condition of the hatch until libelant reached a point where he could readily look into the hatch. In summary, libelant was the architect of his own injury by his failure to exercise even the slightest degree of care for his own safety. In making this statement the Court is well aware of the familiar rule of law that a seaman does not assume the risk of negligence on the part of his fellow seamen, or of unseaworthiness of the vessel, but we have neither negligence nor unseaworthiness in this case.

### Wage Claim

■■ Libelant was in the status of a detained seaman when taken to the hospital in Norfolk. Libelant admits that a representative of the British Consul visited him at the hospital and advised him that he had libelant's passport and wages. He asked libelant if he wanted any money and was advised to give him $5.00 or $6.00 for cigarettes. Actually the amount left with libelant was $5.60. This transaction took place within five or six days after libelant entered the hospital. On September 9, 1960, when libelant was discharged from

the hospital as fit for travel, the balance of earned wages due was paid to libelant's proctor. There can be no "waiting time" imposed where this was in accord with libelant's wishes. From a practical standpoint, the hospital authorities do not want seamen to keep large sums of money among their possessions while in the hospital because of the chance of theft. While this would not afford an escape from the "waiting time" penalty if libelant had requested that he be paid, such is not the situation here.

### Maintenance

Proctors admit that the case is controlled by the laws of Great Britain. We have not discussed this phase of the case as to the claim for damages as the laws of our sister nation are comparable to the laws of the United States, although it is not believed that the concept of unseaworthiness has necessarily reached the liberal view which has been adopted in this country.

■ On the claim for maintenance libelant is not entitled to recover by reason of §§ 34(1) and 45 of the Merchant Shipping Act of 1906 and § 7 of the Merchant Shipping Act of 1948. Libelant was repatriated on September 23, 1960, and under British law there was no duty to maintain him after his arrival at the "proper return port" as defined therein. Actually, libelant returned to work on November 1, 1960. Under the laws of the United States he would probably be entitled to some maintenance, although there has been no showing as to the cost of same. Following libelant's discharge from the hospital and until he was repatriated at respondent's expense, he was maintained.

The libel will be dismissed with costs. Proctors for respondents will prepare and present, after opportunity for inspection and endorsement, an appropriate decree in accordance with this memorandum which is adopted by the Court as its findings and conclusions as provided by Admiralty Rule 46½.